Filed 8/21/15 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| CARSON HARBOR VILLAGE, LTD., | B250111 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BS133538) |
| v. | |
| CITY OF CARSON, | **ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING** |
| Defendant and Appellant, | [No Change in Judgment] |

GOOD CAUSE appearing, the opinion filed July 31, 2015, in the above entitled matter is hereby modified as follows:

1.      On page 17, lines 7-9 of section 6.1 of our DISCUSSION, delete the sentence that begins "Abandoned oil wells" and concludes "in the mid-1990s" in its entirety and replace it with the following:  "Abandoned oil wells were located near or within the wetlands.  Contamination from dumping of oil by-products led to extensive litigation by the park against the well operators and others in the mid-1990s to recover its clean-up costs."

2.      On page 20, line 6 from the bottom, change "oil well contamination" to "oil contamination".

3.      On page 22, line 3, add the following footnote after the first sentence:  "The park contended in its federal court action for contamination from dumping oil by-products that certain government agencies were also liable for lead on the property that

resulted from contaminated storm water runoff.  (*Carson Harbor Vill. v. Unocal Corp.*, *supra*, 270 F.3d at p. 869.)"

There is no change in judgment.

Petition for rehearing is denied.


_____

RUBIN, J.                                                                                    FLIER, J.



I would grant the petition.



_____

BIGELOW, P. J.

Filed 7/31/15  (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| CARSON HARBOR VILLAGE, LTD., | B250111 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BS133538) |
| v. | |
| CITY OF CARSON, | |
| Defendant and Appellant, | |

APPEAL from a judgment of the Superior Court of Los Angeles County. James C. Chalfant, Judge.  Reversed and remanded with directions.

Aleshire & Wynder, William W. Wynder, Sunny K. Soltani and Jeff M. Malawy, for Defendant and Appellant.

Gilchrist & Rutter, Richard H. Close, Thomas W. Casparian, and Yen N. Hope, for Plaintiff and Respondent.

_____

The City of Carson appeals from the judgment in this mandate action directing it to approve Carson Harbor Village, Ltd.'s application to convert its mobilehome park from a rental facility to a subdivision of resident-owned lots. We reverse because substantial evidence supports the City's findings that allowing the conversion would be inconsistent with the open space element of its general plan by placing at risk a state and federally regulated wetlands area within the confines of the mobilehome park.

## OVERVIEW

Cities must have general plans governing development, including the protection of open space, and must also deny proposed subdivisions that are inconsistent with their general plans. (Gov. Code, §§ 65300, 65302, 66474, subd. (b), 66498.6, 65567.)[1] The conversion of a mobilehome park from individual space rentals to lot ownership is a subdivision subject to the subdivision laws. (§§ 66424, 66427.4, 66427.5, 66428.1.) The statute governing that procedure is concerned with protecting low-income renters and a proposed conversion may be denied if the applicable local agency determines that the proposal is a sham designed to dodge local rent control ordinances. (§ 66427.5.) However, that statute limits the scope of the local agency's hearing to the issue of compliance with those statutory requirements. (§ 66427.5, subd. (e).)

Previous Courts of Appeal held that the scope of hearing provision barred local agencies from imposing additional conditions related to the bona fide conversion issue. In reliance on those decisions, we held in our earlier decision in this case that the scope of hearing provision also prevented local agencies from denying a proposed mobilehome park conversion if it was inconsistent with elements of a city's general plan. (*Carson Harbor Vill., Ltd. v. City of Carson* (Apr. 30, 2010, B211777) [nonpub. opn.] (*Carson Harbor I*).) Our Supreme Court's later decision in *Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783 (*Pacific Palisades*) has led us

---

[1] All further undesignated section references are to the Government Code.

2

to reconsider that part of our decision in *Carson Harbor I* and conclude that at least under the facts of this case, they now can.

## FACTS AND PROCEDURAL HISTORY

Carson Harbor Village, Ltd. (the park), is a mobilehome park in the City of Carson (City). It consists of 420 rental spaces on 70 acres of land, 17 acres of which are federally and state regulated wetlands and which is the only open space area within the City. In 2007 the City rejected the park's application to convert from rental spaces to a subdivision of individually owned lots. The primary reason for the denial was the City's finding that the proposed subdivision was a sham intended to skirt the City's rent control laws, based on the supposed inadequacy of tenant support surveys, as well as a lack of tenant support. The City also denied the application because the proposed subdivision was inconsistent with the affordable housing and open space elements of its general plan.[2]

A 2008 mandate action by the park led to a trial court judgment against the City. The trial court found that: (1) even though a 2005 tenant survey had been inadequate, a 2007 survey by the park had been properly conducted; (2) in any event, the application could not be rejected based on a lack of tenant support; and (3) the City could not deny the application for inconsistency with its general plan. The City appealed and we reversed in part and affirmed in part in *Carson Harbor I, supra*.

We held that the City could find the subdivision plan was a sham based on the lack of tenant support and remanded the matter back to the trial court with directions to order the City to reconsider the application in light of the 2007 survey, along with directions to receive additional information that would clarify or supplement the application and the evidence received before. (*Carson Harbor I, supra,* slip opn. at pp. 7-10.) We also held

---

[2] Although the parties' primary focus has been on issues related to the extent of tenant support for the proposed conversion, our decision is based solely on the open space issue under the City's general plan. We therefore discuss the tenant support issues only briefly.

3

that the City could not reject the application based on its supposed inconsistency with elements of its general plan.  (*Id.* at pp. 10-11.)[3]

On remand, the City held new public hearings in 2011 and once more rejected the park's subdivision application.  The City found that even though purchase incentives offered by the park had increased tenant support from 11 percent to 24 percent, that level of support was insufficient.  The City also found that the proposed conversion was not bona fide because it was unlikely that many of the low income tenants living in the park would agree to buy their lots, the tenant survey improperly gauged support for the incentives, not the conversion, and the required tenant impact report did not include information requested about the wetlands and the displacement effect on current tenants.  The City alternatively denied the application because it was inconsistent with its general plan's affordable housing and open space elements and posed a risk to the wetlands and its wildlife.  (§ 66474, subds. (b) & (e).)

The park brought another mandate action.  The trial court issued an interim order that the City conduct a new hearing, and take expert evidence, concerning only the issue of whether the proposed conversion was bona fide.  In 2012, the City held that hearing and once more rejected the park's subdivision application.  The matter returned to the trial court, which found for the park on the bona fide conversion issue.  The trial court also found that, in part based on our prior opinion, inconsistency with a local agency's general plan was not a proper ground to deny the application and that, in any event, there was no evidence the park's proposal was inconsistent with the City's general plan.

## STANDARD OF REVIEW

We review the City's decision to deny the park's subdivision application under the substantial evidence standard.  (*218 Properties, LLC v. City of Carson* (2014) 226 Cal.App.4th 182, 189 (*218 Properties*).)  We do not review and are not bound by the trial court's factual findings or legal conclusions.  (*Ibid.*)  Instead, our scope of review is

---

**3**     As we set forth in section 5 of our DISCUSSION, we were wrong.  (See also fn. 7, *post*.)

4

the same as the trial court's: we examine the entire record to determine whether the City's findings were supported by substantial evidence. (*Ibid.*) However, we begin with the presumption that the findings are supported by substantial evidence. It is the park's burden to prove otherwise. (*Carson Harbor Village, Ltd. v. City of Carson Mobilehome Park Rental Review Bd.* (1999) 70 Cal.App.4th 281, 287.)

## DISCUSSION

1.      *The Laws Regarding General Plans and Subdivisions*

All local governments must have a comprehensive and long-term general plan for the development of land within their boundaries. (§ 65300.) The general plan sits atop the hierarchy of land use regulations. (*DeVita v. County of Napa* (1995) 9 Cal.4th 763, 773 (*De Vita*).) Acting much like a land-use constitution, it is the basic charter governing the direction of future land use within a locality. (*Lesher Communications, Inc. v. City of Walnut Creek* (1990) 52 Cal.3d 531, 540, 542.) The propriety of virtually any local land use decision depends upon its consistency with the general plan. (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 570.)

The general plan must include seven elements – land use, circulation, conservation, housing, noise, safety, and open space – and must address each in whatever level of detail local conditions require. (*DeVita, supra,* 9 Cal.4th at p. 773; §§ 65301, 65302.) Open-space land includes areas designated for the preservation of natural resources such as plant and animal life, including habitats for fish and wildlife species, along with streams and watershed lands. (§ 65560, subd. (b)(1).)

When enacting the open space elements law, the Legislature made several findings. (§ 65561.) The Legislature found that preserving open-space land was "necessary not only for the maintenance of the economy of the state, but also for the assurance of the continued availability of land for the production of food and fiber, for the enjoyment of scenic beauty, for recreation and for the use of natural resources." (§ 65561, subd. (a).) The Legislature also found that increasing population "demands

5

that cities, counties, and the state at the earliest possible date make definite plans for the preservation of valuable open-space land and take positive action to carry out such plans by the adoption and strict administration of laws . . . ." (§ 65561, subd. (c).) Therefore the open space elements law was "necessary for the promotion of the general welfare and for the protection of the public interest in open-space land." (§ 65561, subd. (e).)

The Legislature also declared its intent in adopting the open space element law: "(a) To assure that cities and counties recognize that open-space land is a limited and valuable resource which must be conserved wherever possible. [¶] (b) To assure that every city and county will prepare and carry out open-space plans which, along with state and regional open-space plans, will accomplish the objectives of a comprehensive open-space program." (§ 65562.) Therefore, "[n]o building permit may be issued, no subdivision map approved, and no open-space zoning ordinance adopted, unless the proposed construction, subdivision or ordinance is consistent with the local open-space plan." (§ 65567.)

The Subdivision Map Act (§§ 66410-66499.37 (the Map Act)) is the primary regulatory control over the subdivision of real property in California. (*Pacific Palisades, supra,* 55 Cal.4th at p. 798.) The Map Act is designed to promote orderly community developments and involves an application process that culminates in public hearings to determine whether a subdivision map will be approved. (*Id.* at p. 799.) The Map Act lists a number of circumstances that require denial of a map, including inconsistency with an applicable general plan (§ 66474, subd. (b)), and the likelihood that the proposed subdivision will cause substantial environmental damage or substantially and avoidably injure fish or wildlife or their habitat. (§ 66474, subd. (e).) Mobilehome park conversions are subdivisions subject to the Map Act. (§§ 66424, 66427.4, 66427.5, 66428.1; *Pacific Palisades,* at p. 800.)

2.      *Mobilehome Park Conversion Statutes*

In 1984, the Legislature passed the Mobilehome Park Resident Ownership Program (Health & Saf. Code, § 50780, et seq., (MPROP)) because mobilehome parks –

6

a significant source of affordable housing – were threatened by cost increases, physical deterioration, and pressures to convert them to other uses. (*Pacific Palisades, supra,* 55 Cal.4th at pp. 803-804.) MPROP was designed to encourage and facilitate the conversion of mobilehome park ownership by either residents, local public entities, or qualified nonprofit housing sponsors. To that end, MPROP provides for public financing assistance for mobilehome park conversions. (*Id.* at p. 804.)

In 1991, the Legislature enacted the provision in dispute here – section 66427.5. Although it has gone through a cycle of judicial interpretations and responsive legislative amendments, its essence remains the same. When a mobilehome park's owner seeks to convert from rental to resident ownership by way of the subdivision process, it must take certain steps in order to avoid the economic displacement of residents who choose not to buy. The owner must: (1) offer each existing tenant an option to either buy his current rental space or continue as a tenant; (2) file a report on the impact of the conversion on the tenants; (3) obtain a survey of tenant support for the proposed subdivision pursuant to an agreement with any resident homeowners' association; (4) submit the survey results to the agency that will act on the subdivision application; and (5) for low income nonpurchasing residents, apply a rent control formula for the ensuing four years. (§ 66427.5, subds. (a)-(e).)[4]

The process culminates in a hearing before the applicable local agency with authority to approve or disapprove the proposed subdivision. (§ 66427.5, subd. (e).) The troublesome issue here arises from the remainder of that subdivision, which states that "[t]he scope of the hearing shall be limited to the issue of compliance with this section." (*Ibid.*) We next consider how that subdivision has been construed.

---

[4] The statute was amended in 2013 to provide that the local agency may deny a subdivision application if less than half the residents approve of the conversion. (§ 66427.5, subd. (d)(5).) Therefore, if the City were to consider the application in the first instance today, it could deny it based solely on the most recent tenant survey results. The City contends that we can and should apply this new provision on appeal. However, we held in *218 Properties, supra,* 226 Cal.App.4th 182 that the City could not do so. (*Id.* at p. 194, fn. 7.) In any event, because we reverse on another ground we need not revisit that issue.

7

3.      *Legislative History of, and Appellate Decisions Construing, Section 66427.5*

When section 66427.5 was enacted in 1991, it applied to only mobilehome subdivision conversions using public financing under MPROP. (Stats. 1991, ch. 475, § 2, p. 3324; *Colony Cove Properties, LLC v. City of Carson* (2010) 187 Cal.App.4th 1487, 1498-1499 (*Colony Cove*).) The statute was amended in 1995 to remove the MPROP restriction and permit its application to all proposed mobilehome park conversions. (Stats. 1995, ch. 256, § 4, p. 883.) The 1995 amendment added provisions to avoid the economic displacement of tenants, including the requirements to: (1) offer residents a choice between buying or remaining as tenants; and, (2) file a report from the owner on the impact of the proposed conversion. (*Ibid.*) The 1995 amendment also added language to what was then subdivision (d) requiring a public hearing on the proposed subdivision that "shall be limited to the issue of compliance with this section." (*Ibid.*) These amendments were silent on whether the conversion must be bona fide.

The court in *Donohue v. Santa Paula West Mobile Home Park* (1996) 47 Cal.App.4th 1168, held that local rent control ordinances remained in effect after a subdivision was approved, but only until the first lot was sold. (*Id.* at p. 1175.) Worried that mobilehome park owners might take advantage of that holding and obtain relief from rent control once a single lot had been sold, the City of Palm Springs passed an ordinance requiring a showing that the proposed conversion was bona fide. This included a delay in lifting rent control until escrow closed on one-third of the lots. The court in *El Dorado Palm Springs, Ltd. v. City of Palm Springs* (2002) 96 Cal.App.4th 1153 (*El Dorado*), held that the ordinance violated section 66427.5 because the 1995 amendments strictly limited local agencies from imposing conditions beyond those required by the statute. (*El Dorado,* at pp. 1165-1166.)

The Legislature amended section 66427.5 in response to *El Dorado* by moving the compliance hearing requirement to subdivision (e) and adding a new subdivision (d) that required the subdivider to obtain and provide a survey of the tenants in order to determine their support for the proposed conversion. (§ 66427.5, subd. (d), added by Stats. 2002,

8

ch. 1143, § 1, p. 7399; *Pacific Palisades, supra,* 55 Cal.4th at p. 809.) The Legislature also enacted, but did not include in the codified amendments, a statement that it intended to address *El Dorado* and ensure that mobilehome park conversions under section 66427.5 were bona fide. (Stats. 2002, ch. 1143, § 2, pp. 7399-7400.) However, the Legislature rejected a proposed amendment that would have given local agencies the authority to impose additional conditions they found " 'necessary to preserve affordability or to protect nonpurchasing residents from economic displacement.' " (Sen. Amend. to Assem. Bill No. 930 (2001-2002 Reg. Sess.) June 26, 2002, § 1, p. 3, italics omitted; *Pacific Palisades,* at p. 809.)

In *Sequoia Park Associates v. County of Sonoma* (2009) 176 Cal.App.4th 1270 (*Sequoia Park*), the court invalidated a county ordinance that set a sliding scale percentage of tenant support in order to determine whether a proposed conversion was bona fide. The court held that through section 66427.5 the Legislature had expressly and impliedly preempted any local regulation of mobilehome park conversions. (*Sequoia Park,* at pp. 1275, 1297-1300.) The court in *Colony Cove, supra,* 187 Cal.App.4th 1487 invalidated a similar ordinance enacted by the City of Carson, holding that the 1995 amendments to section 66427.5 prevented local agencies from adopting tougher measures regulating mobilehome park conversions. (*Colony Cove,* at p. 1506.) The court added that the Legislature's rejection of a proposal to allow local agencies to add conditions showed that "it continues to oppose local deviation from or addition to the statutory criteria." (*Ibid.*)

4. *The* Pacific Palisades *Decision*

Two sets of statutes, not directly involved in the current appeal, were at issue in *Pacific Palisades*: the Coastal Act and the Mello Act. The Coastal Act (Pub. Resources Code, § 30000 et seq.) empowers local agencies to regulate development within the state's entire coastal zone. (Pub. Resources Code, § 30001.) The Mello Act (Gov. Code, §§ 65590, 65590.1) supplements the housing element provisions of the Government Code's general plan scheme by establishing minimum requirements for affordable

9

housing within the coastal zone. (§ 65590, subds. (b) & (k); *Pacific Palisades, supra,* 55 Cal.4th at p. 798.) The *Pacific Palisades* court considered whether a proposed mobilehome park subdivision in the coastal zone was subject to those provisions, or whether Government Code section 66425.7 occupied the field and barred their use by local agencies when considering a conversion application.

The park owner in *Pacific Palisades* brought a mandate action against the City of Los Angeles after the city refused to accept its subdivision application without also providing applications for a coastal development permit and for Mello Act approval. The trial court found for the owner, concluding that section 66427.5 set forth the exclusive requirements for subdivision approval, thus exempting the Coastal Act and the Mello Act from the subdivision application process. The Court of Appeal reversed, holding that the policy considerations behind the Coastal Act and Mello Act were more extensive than, and therefore took precedence over, those embodied in section 66427.5.

The Supreme Court affirmed, rejecting the park owner's contentions that, in line with *El Dorado, Sequoia Park,* and *Colony Cove*, Government Code section 66427.5 prevented local agencies from straying outside the requirements imposed by that section when passing on proposed mobilehome park conversions. Key to its analysis was the important policy considerations embodied in both the Coastal Act and Mello Act. In enacting the Coastal Act, the Legislature found that the state's coastal zone was "a distinct and valuable natural resource of vital and enduring interest to all the people," that permanently protecting this resource was a "paramount concern" that was "necessary to protect the ecological balance of the coastal zone," and that making sure future developments complied with the act was "essential to the economic and social well-being of the people of this state . . . ." (Pub. Resources Code, § 30001, subds. (a) & (d).) The Coastal Act relies heavily on local governments to achieve its purposes, and development permits issued under the Coastal Act are not just a matter of local law but also embody state policy. (*Pacific Palisades, supra,* 55 Cal.4th at p. 794.) The Coastal Act is to be liberally construed. (Pub. Resources Code, § 30009.)

10

As for the Mello Act, the court looked to the housing element provisions of the general plan statutes, as to which the Legislature declared: "[t]he availability of housing is of vital statewide importance;" and "decent housing and a suitable living environment for every Californian . . . is a priority of the highest order." (§ 65580, subd. (a).) The Mello Act supplements these provisions in the coastal zone, the court held. (*Pacific Palisades, supra,* 55 Cal.4th at p. 798.)

These "[s]ignificant state policies favor an interpretation of . . . section 66427.5" that does not strip away Coastal Act and Mello Act jurisdiction over land use within the coastal zone. (*Pacific Palisades, supra,* 55 Cal.4th at p. 803.) The *Pacific Palisades* court rejected the park owner's reliance on MPROP as a superseding legislative policy that favored mobilehome park conversions by simplifying the approval process for those conversions. "[N]othing in . . . section 66427.5 suggests a belief by the Legislature that this policy is of more importance than and overrides the 'paramount' and 'vital' concerns of the Coastal Act and the Mello Act." (*Id.* at p. 804.)

This conclusion was supported by other factors: (1) section 66498.6, subdivision (b) of the Map Act states that nothing in that act affects a subdivider's or local agency's obligations to comply with applicable state and federal laws, regulations or policies; (2) the other interests at stake; and (3) the absence of language in section 66427.5 that expressly excepts mobilehome park conversions from those laws, regulations, or policies. (*Pacific Palisades, supra,* 55 Cal.4th at p. 805.) These factors "strongly suggest [that section 66427.5], like other provisions of the Subdivision Map Act, is intended to operate in conjunction with other state laws." (*Ibid.*)

The *Pacific Palisades* court also relied on rules of statutory construction requiring the courts to harmonize and reconcile inconsistencies between statutory provisions wherever possible and, absent an express declaration of legislative intent, to avoid implied repeals unless the conflicting provisions were fatally irreconcilable and inconsistent. (*Pacific Palisades, supra,* 55 Cal.4th at p. 805.) Applying these rules, the Supreme Court held that section 66427.5 could be "construed to require a hearing devoted exclusively to the issue of economic displacement of tenants *in addition* to the

11

procedures and hearings required by other state laws." (*Pacific Palisades, supra,* at p. 805, original italics.) "Such a construction is consistent with the general application of the Subdivision Map Act *and* the Coastal Act and the Mello Act to developments within the coastal zone, harmonizing the provisions of all three acts." (*Ibid,* original italics.) It was also consistent with the Mello Act's express mandate that it applied to mobilehome park conversions within the coastal zone. (*Id.* at pp. 805-806, citing § 65590, subds. (b) & (g)(1).) The contrary construction advanced by the park owner not only failed to harmonize the three acts; it would also lead to an implied partial repeal by overriding their provisions. (*Pacific Palisades,* at p. 806.)

Finally, the Supreme Court rejected the park owner's reliance on *El Dorado, Sequoia Park,* and *Colony Cove*, including the Legislature's decision to forego an amendment that would have given local agencies additional regulatory authority. At issue in those decisions was a local agency's attempt to add further conditions to section 66427.5 in order to avoid economic displacement of the park's tenants. None considered "the specific issues presented by this case: whether the section exempts conversions from other state laws, such as the Coastal Act and the Mello Act, or bars local agencies from exercising the authority delegated to them by the Coastal Act and the Mello Act to require compliance with those acts and to reject or deny applications that do not establish compliance." (*Pacific Palisades, supra,* 55 Cal.4th at pp. 809-810.)

5.      *The General Plan Open Space Element May Be Considered as Part of the Mobilehome Park Conversion Process*

The City contends that *Pacific Palisades'* reasoning applies to its reliance on the open space element of its general plan as an alternative ground for denying the park's conversion application. We agree.

The policy concerns that underlie the open space element are strikingly similar to those of the Coastal Act that the *Pacific Palisades* court found so persuasive. In the Coastal Act, the Legislature declared that the coastal zone was a "paramount concern" whose protection was "necessary" to protect a valuable resource that was "essential" to

12

the economic and social well-being of Californians. (Pub. Resources Code, § 30001, subds. (a) & (d); *Pacific Palisades, supra,* 55 Cal.4th at pp. 794, 804.) Likewise, the Legislature found that the open space elements law was "necessary" to maintain the economy and to assure the availability of land for agriculture, recreation, and scenic beauty. (Gov. Code, § 65561, subd. (a).) Our increasing population demanded that local agencies take positive action to protect open space, and that the open space laws were "necessary" to promote the general welfare and protect the public's interest in maintaining this limited and valuable resource. (Gov. Code, §§ 65561, subds. (c) & (e), 65562, subd. (a).)

The existence of these policies brings into play the same interpretive rules promoting statutory harmonization and rejecting implied repeals that motivated the *Pacific Palisades* court. Under the Map Act, local agencies must reject a proposed subdivision if it is inconsistent with their general plan. (§ 66474, subd. (b).) And while a local agency may approve a vesting tentative subdivision map that departs from local ordinances, policies, and standards (§§ 66474.2, 66498.1, & 66498.4) those departures are permitted only to the extent they are "authorized under applicable law." (§ 66498.4.) Furthermore, nothing in these tentative vesting map provisions "removes, diminishes, or affects the obligation of any subdivider to comply with the conditions and requirements of any state or federal laws, regulations, or policies and does not grant local agencies the option to disregard any state or federal laws, regulations, or policies." (§ 66498.6, subd. (b); see *Pacific Palisades, supra,* 55 Cal.4th at p. 805.) Likewise, the general plan open space law states that no subdivision may be approved unless it is consistent with a local open space plan. (§ 65567.)

Although the park relies on the availability of MPROP public financing to show that its proposed subdivision will not displace tenants, that act requires compliance with local plans and zoning laws as a prerequisite to funding.[5] (Health & Saf. Code, § 50786,

---

[5] The actual availability of those funds in light of the state's recent budget problems was in dispute.

13

subd. (d)(3).) We do not see how the City could approve the subdivision based on the prospect of public financing for low incomes residents if the switch would be inconsistent with its general plan.

Section 66427.5 says nothing about excepting mobilehome park conversions from those requirements. (*Pacific Palisades, supra,* 55 Cal.4th at p. 805.) Instead, section 66427.5 can be read to require a hearing on tenant economic displacement wholly apart from considerations of the open space element of the City's general plan. To hold otherwise would not just fail to harmonize these statutory provisions; it would also lead to their implied partial repeal. (*Id.* at pp. 805-806.)[6]

The park does not address these concerns. Instead, it contends we cannot follow *Pacific Palisades* for three reasons: (1) our holding in *Carson Harbor I* that general plan inconsistency was not an available ground for denying a proposed mobilehome park conversion is law of the case; (2) the *Pacific Palisades* holding is limited to the Coastal Act and the Mello Act; and (3) under section 66427.2, conversions to condominium ownership are exempt from the Map Act's requirements. We take each in turn.

First, the park relies on outdated authorities to support its law of the case contention. An intervening Supreme Court decision such as *Pacific Palisades* has for some time been considered an exception to the law of the case doctrine. (*Davies v. Krasna* (1975) 14 Cal.3d 502, 507, fn. 5; *Ryan v. Mike-Ron Corp.* (1968) 259 Cal.App.2d 91, 96-97.) The Court of Appeal decision in *Pacific Palisades* was filed in August 2010, and review was granted in December 2010 (case No. S187243), months after our decision in *Carson I.* The City's 2011 resolution denying the park's subdivision application expressly relied on general plan inconsistency as an alternative ground in the event the Supreme Court affirmed the Court of Appeal's *Pacific Palisades* decision. The Supreme Court did so, and as a result the law of the case exception applies here.

Second, we acknowledge that the *Pacific Palisades* court limited its holding to the applicability of the Coastal Act and the Mello Act to mobilehome park subdivisions.

---

**6**     This conclusion carries extra weight in light of Health & Safety Code section 50786.

14

(*Pacific Palisades, supra,* 55 Cal.4th at p. 803.) That was the issue presented to the court. The park contends that the court did more than that, reiterating the holdings of *El Dorado, Sequoia Park,* and *Colony Cove* that "section 66427.5 precludes local regulation of mobilehome park conversions to resident ownership." The park omits both the context and the court's qualifying language, which distinguished those decisions despite their seemingly broad statements precluding local regulation of mobilehome park conversions because none addressed "*the specific issues presented by this case: whether the section exempts conversions from other state laws,* such as the Coastal Act and the Mello Act, or bars local agencies from exercising the authority delegated to them by [those acts] to require compliance with those acts . . . ." (*Pacific Palisades,* at p. 810, italics added.)

In its introductory paragraph, the *Pacific Palisades* court framed its holding as a rejection of the notion that section 66427.5 exempts mobilehome park conversion "from the need to comply with other state laws, . . ." (*Pacific Palisades, supra,* 55 Cal.4th at p. 792.) Elsewhere, the court distinguished *El Dorado, Sequoia Park*, and *Colony Cove* and held that the factors underlying its analysis "strongly suggest that [§ 66427.5] *like the other provisions of the Subdivision Map Act, is intended to operate in conjunction with other state laws.*" (*Id.* at p. 805.) Based on this, we do not read *Pacific Palisade* to preclude its application where other state laws are concerned. To the contrary, we see it as an invitation to consider that issue and apply *Pacific Palisade's* reasoning where appropriate.

Finally, the park contends that section 66474 of the Map Act was not applicable under section 66427.2, which states: "Unless applicable general and specific plans contain definite objectives and policies, specifically directed to the conversion of existing buildings into condominium projects or stock cooperatives, . . . [section 66474 and others not relevant here] shall not apply to condominium projects or stock cooperatives, which consist of the subdivision of airspace in an existing structure, unless new units are to be constructed or added."

This contention was raised without discussion or analysis of how it might apply here. For instance, the park simply assumes, without citation to authority, that

15

Government Code section 66427.2 applies to mobilehome parks. We acknowledge that a mobilehome park might qualify under Civil Code section 4125, subdivision (b), which defines a condominium project as an undivided interest in the common area of real property, along with a separate interest in space called a unit, whose boundaries are included in a recorded final map. Even so, the park does not address why or whether the park's proposed subdivision "consist[s] of the subdivision of airspace in an existing structure, . . ." (Gov. Code, § 66427.2.) Nor does it explain why or whether the City's open space element fails to include the requisite definite objectives and policies. (Gov. Code, § 66427.2.) We therefore deem the issue waived. (*Santillan v. Roman Catholic Bishop of Fresno* (2012) 202 Cal.App.4th 708, 732.)

We alternatively affirm on the merits of this issue. First, the City's open space element defines the wetlands as the *only* open space area that required preservation as a habitat for plant and animal life. In light of the City's findings concerning the environmental risks posed by the proposed conversion (see DISCUSSION, § 6.1, *post*), the open space element's stated need to preserve the only available open space is a specific enough directive as it arises exclusively in the context of the mobilehome grounds. The park does not suggest, and we do not believe, that anything more need be said, at least on the facts of this case.

Second, applying Government Code section 66427.2 on these facts would conflict with several other provisions. These include: section 66474, subdivision (e), which requires the disapproval of a proposed subdivision that poses a sufficient risk to the environment or fish and wildlife; section 66567 of the General Plan scheme, which prohibits subdivision approvals that conflict with a local open space plan; section 66498.6, subdivision (b), which prohibits disregard of state laws and policies when approving a vesting tentative map; and MPROP, which requires compliance with local plans in order to obtain the public-assistance financing that the park relies on to show that the proposed conversion will be affordable for its low-income tenants. (Health & Saf. Code, § 50786, subd. (d)(3).)

16

In short, whatever application section 66427.2 might have here is outweighed by the competing statutory and policy considerations requiring compliance with the City's open space element in order to preserve that valuable resource. For the reasons set forth above, we therefore hold that local agencies may deny a proposed mobilehome park subdivision that is inconsistent with the open space element of their general plans.[7] We next consider whether the evidence in this case supports the City's decision to do so.

6.      *Substantial Evidence Supports the City's Finding of Inconsistency With Its General Plan Open Space Element*

6.1  The City's Contentions

The abridged version of the City's open space findings goes like this: the wetlands, which is the City's only open space, would be at risk from the proposed conversion to a common interest ownership because the residents would become unwilling and unsuitable stewards of that natural resource.

This conclusion was based on several factors. The open space element of the City's General Plan identifies the wetlands as the City's only open space area that required preservation as a habitat for plant and animal life. Abandoned oil wells were located within the wetlands, and leakage from one caused contamination, leading to extensive litigation over the clean-up costs in the mid-1990s. The park settled that

---

[7]      By doing so we acknowledge that we were wrong to hold otherwise in *Carson Harbor I, supra*. Presiding Justice Bigelow's dissent in that case pointed out that section 66427.5 was merely a "preliminary step in the subdivision process in the context of a mobilehome park conversion, adding a special hearing on the limited issue of resident displacement under the section as a whole, apart from the normally followed processes for approval of a tentative map [citation] and approval of a final map [citation]. I do not believe that section 66427.5, subdivision (e), was intended to eliminate the broader structure of the Subdivision Map Act vis-à-vis a tentative map and a final map, and the approval of the same. . . . As I read the statutes, once a subdivider and local agency have finished the required hearing to determine compliance with section 66427.5, the now-deemed compliant informational materials, are ready for the tentative map approval process." (*Carson Harbor I, supra,* slip opn. at p. 15, dis. opn. of Bigelow, P. J.) As we read *Pacific Palisades,* she was correct.

17

litigation and agreed to assume liability for future contamination. The wetlands serves as an outlet for several tributaries, which had been the cause of past contamination and concomitant litigation. Future contamination from illegal or accidental dumping of hazardous materials was still possible. Routine maintenance and general upkeep of items such as flood gates and drains were costly. The wetlands was subject to a complex scheme of state and federal regulations governing its maintenance. Residents were concerned about the time and costs involved in maintaining the wetlands, as well as future liability for contamination, and would be unable to meet their maintenance obligations or incur the costs required to do so if the mobilehome park conversion were approved.

On appeal, the City relies on *Dunex, Inc. v. City of Oceanside* (2013) 218 Cal.App.4th 1158 (*Dunex*) to support these contentions. The *Dunex* court considered the appeal of a mobilehome park owner from Oceanside's denial of its application to convert to residential ownership. The mobilehome park was located within the coastal zone and therefore subject to the Coastal Act. The owner declined to provide an environmental report because the proposed subdivision would result in no physical changes to the property. The mobilehome park was located in a flood plain and one reason that Oceanside denied the application was its inconsistency with the city's local coastal plan.

Based on *Pacific Palisades, supra,* 55 Cal.4th 783, the *Dunex* court held that the application could be denied for inconsistency with Oceanside's local coastal plan. (*Dunex, supra,* 218 Cal.App.4th at pp. 1168-1169.) The court held that the city was warranted in finding that the proposed subdivision was inconsistent with its local coastal plan, which required minimization of risks to life and property in high flood areas. Even though the change in ownership would not add lots or create any physical changes to the property, "the city could reasonably conclude that individual ownership would be an unacceptable increase in the risk to life and property *because it would move the flood risk to individuals far less able to either respond to or bear that risk than a single* [mobilehome park] *owner.*" (*Id.* at p. 1169, italics added, fn. omitted.)

18

The City contends that the *Dunex* rationale applies with equal force here because the evidence shows an unacceptable increase in the risk to the open space habitat if the individual residents became responsible for the wetlands, including its maintenance and any future contamination liability. The park does not discuss this issue and we therefore deem it waived. (*Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1247-1248.)

We alternatively conclude on the merits that the *Dunex* rationale applies here. First, this notion finds support in MPROP, where the Legislature provided that ownership by public entities or nonprofits was appropriate for older mobilehome parks whose residents "may collectively lack the experience or other qualifications necessary to successfully own and operate their own parks" because they were more likely to be threatened by physical deterioration. (Health & Saf. Code, § 50780, subd. (a)(3).) Second, it is the logical extension of our holding that *Pacific Palisades* extends to mobilehome park subdivisions that violate the open space element of a local agency's general plan. Transferring open space to unwilling guardians who lack the resources to adequately protect it surely poses a meaningful risk to that land, especially in light of the legislative mandate to strictly administer the open space laws. (Gov. Code, § 65561, subd. (c).) We next consider whether substantial evidence supports such a finding.

### 6.2  The Evidence Supports a Finding of Open Space Risk

A November 2003 environmental assessment report prepared at the request of the park's lawyers identified three oil wells in and around the wetlands that were active until they were abandoned and plugged in accordance with state law in 2002. Lab tests showed that residual hydrocarbon contamination above regulated levels was still present at one of those wells.

The report said that oil drilling and related activities began in 1938, with photographs showing "several oil derricks, mud pits, stock tanks and production equipment in the central and northern portions of the site." That basic configuration continued into the 1980s, when the property was converted into a mobilehome park.

Three or more oil wells and associated drilling and production equipment were on the site from 1938 through 2002, and it was possible that unreported "wildcat" wells could be on or near the site.[8]  Oil and gas wells "are potential concerns when they seep oil or gas, and are not abandoned to current regulations, or have associated surface contamination.  They may also be associated with methane hazards."

The park's environmental report determined that the site's oil production history was a recognized environmental concern under standard testing methods.  That "means the presence or likely presence of hazardous substances or petroleum products on a property under conditions that indicate an existing release, a past release, or a material threat of a release of any hazardous substances or petroleum products . . . ."  Although the report concluded the risks were not significant, the park's status as a recognized environmental concern was "not intended to include *de minimis* conditions that generally do not present a material risk of harm to public health or the environment and that generally would not be the subject of an enforcement action if brought to the attention of appropriate governmental agencies."  (Original italics.)

The City's 2011 resolution denying the park's application relied in part on *Carson Harbor Vill., Ltd. v. Unocal Corp.* (9th Cir. 2001) 270 F.3d 863, to verify that the park had sued the well's operators because of oil well contamination in the wetlands.  According to the Ninth Circuit, the park sued the former well operators in federal court to recover approximately $285,000 in costs incurred from cleaning up lead and petroleum that covered an area measuring 75 feet wide, 170 feet long, and 5 feet deep.  (*Id.* at pp. 868-869.)  Andrew Vasquez, the secretary of the tenants' homeowners association, testified at a 2011 public hearing that the park settled that action and agreed to "accept

---

[8]      The existence of other wells was confirmed in the City's 2012 environmental report, which said that there were 13 abandoned well on the property dating back to the 1920s.  Some of those were plugged with wood or stove pipe casings.  That report was prepared for the court-ordered 2012 hearing on the bona fides of the park's conversion application and therefore was not a basis for the 2011 City finding that the proposed subdivision was inconsistent with its open space plan.  Because we limit our analysis to the open space issue, which was decided by the City in only its 2011 resolution, the 2012 expert evidence plays no part in our analysis.

responsibility for liability for contamination of the park." That testimony was never rebutted.[9]

Documents prepared by the park show that the wetlands is regulated by both the state and federal governments and is home to protected wildlife. A Department of Fish and Game questionnaire filled out by the park in order to obtain permission to perform routine trash removal in the wetlands affirmed that the wetlands had been designated as "wild and scenic" under either state or federal law. An August 7, 2006, letter from the park's lawyers to the City states that streambed maintenance was performed in late June or early July "to avoid disturbing the breeding season of protected wildlife." The letter confirmed that the Department of Fish and Game "has primary oversight over the annual cleanup."

The draft Covenants, Codes & Restrictions (CCRs) that the park prepared as part of the ongoing subdivision approval process states that the wetlands were federally protected and that the homeowners association to be formed upon subdivision "may be obligated, from time to time, to perform certain special maintenance of the Wetlands, which includes, but is not limited to, trash removal, repair of flood control gates, removal of damaged trees and replacement of French drains. The Association hereby affirms those obligations and intends that the City shall be a third party beneficiary of said obligations."

Photographs and written reports document the park's annual clean-up efforts in 2006 and 2007. Approximately 250 trash bags were filled during the 2006 clean up. Photos from both years depict vast amounts of refuse strewn throughout the wetlands, some on the ground, some in the water impeding the flow through flood control gates. Annual maintenance costs were around $50,000.

---

**9** It also appears that despite the park owner's financial resources and legal representation, the park owner was unable to recover his clean-up costs from the well operators under federal law because he failed to comply with its complex requirements. (*Carson Harbor Vill. v. County of L.A.* (9th Cir. 2006) 433 F.3d 1260, applying CERCLA, the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C.S. § 9601 et seq.)

21

During a 2007 hearing, city planning staff member Sheri Repp-Loadsman reported that the park owner had the marsh tested about 10 years earlier due to fears of possible contaminants entering from upstream. Although the Regional Water Quality Control Board found no contamination, Repp-Loadsman believed that the possibility remained because the wetlands accepted flow from other sources.

Several park residents testified in 2011 about their reluctance to take on the responsibility of maintaining the wetlands. In addition to HOA secretary Vasquez's testimony that the park settled its earlier oil contamination lawsuit by agreeing to accept responsibility for contamination, he also testified that "[n]o resident has the skill or specialized training to maintain a state-protected wetlands." Vasquez wondered whether it was reasonable to "expect that mobile home park residents can manage a complex and enormous wetlands" without the financial resources that the park had. Vasquez added that he could not afford the liability that might come from any future oil contamination.

Park resident Louis Cogut testified that buying into the subdivision came with responsibility for the common areas, including "the foul aroma from that marsh." Park resident Martin Garcia testified that the residents could not afford to buy or borrow money to fund a lot purchase. Long-time park resident Ivan Gulligan testified that the park's decaying infrastructure, including the marsh, made buying his lot undesirable. Park resident David White testified at a 2007 hearing that 65 percent of the park's residents were low income, including seniors on fixed incomes with high medical bills. Of those residents voting on the proposed conversion, 65 percent also opposed it.

Instead of engaging in any meaningful discussion or analysis of the evidence on appeal, the park simply restates some of the trial court's findings from the 2008 and 2013 mandate actions. As noted earlier, we do not review the trial court's findings and our focus is instead on the evidence in the administrative record. We therefore hold that the park has waived the substantial evidence issue. (*In re C.R.* (2008) 168 Cal.App.4th 1387, 1393.) We alternatively hold on the merits that the City's open space risk findings are supported by substantial evidence.

22

The evidence shows that the wetlands requires extensive yearly maintenance, subject to regulatory oversight by the state Department of Fish and Game, as well as federal regulations. It has a history of past oil contamination and, according to the park's 2003 environmental report, contamination at one well remains above regulated levels. In addition, the report identifies the site's past oil production activities as a recognized environmental concern, meaning it posed a material, not de minimis, risk of harm to the environment. There is a possibility that other wells remain on the site.

When the park settled its action with well operators, it agreed to accept responsibility for oil contamination. The CCRs for the proposed subdivision would place responsibility for the wetlands directly on the individual lot owners through their homeowners association. The residents, nearly two-thirds of whom are low income, are reluctant or unable to take on that administrative and financial liability. Combined with the facts that the wetlands is the only open space in the City and is home to federally protected wildlife, questions concerning the residents' willingness and ability to tend to this important natural resource supports the City's findings that the proposed mobilehome park conversion was inconsistent with the open space element of its general plan (§ 66474, subd. (b)), and would likely cause substantial environmental damage or substantially injure that habitat and the creatures living there. (*Id.* at subd. (e).) These findings are not necessarily offset by the prospect of the homeowners association hiring a professional management company to oversee the park's day-to-day operations. Once the City determined that the conversion would be inconsistent with the open space element of the City's general plan, the City was required to reject the park's application. (§ 65567.)

23

**DISPOSITION**

The judgment is reversed and the trial court is directed to enter a new and different judgment in favor of the City of Carson.  Appellant shall recover its appellate costs.

RUBIN, J.

I CONCUR:


FLIER, J.

24

**CARSON HARBOR VILLAGE, LTD v. CITY OF CARSON**

**B250111**

**BIGELOW, P. J., Concurring and Dissenting:**


I concur in part and respectfully dissent in part.

I agree with the majority opinion's conclusion that the City of Carson (City) properly considered the issue of whether Carson Harbor Village's (the park) proposed conversion was inconsistent with the City's general plan. As I indicated in *Carson Harbor Village, Ltd. v. City of Carson* (March 30, 2010, B211777) [nonpub. opn.], I do not read the mobile home park conversion statute (see Gov. Code, § 66427.5)[1] to have established a stand alone process granting a park's residents a simple veto by vote over a proposed conversion. Section 66427.5 added a preliminary step in the subdivision process in the context of a mobile home park conversion to resident-owned spaces to address resident displacement concerns, leaving in place the broader structure of the Subdivision Map Act. In *Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, the Supreme Court clarified that section 66427.5 did not strip away Coastal Act and Mello Act jurisdiction over land use matters involving a proposed mobile park conversion. By parity of reasoning, I would find that section 66427.5 does not displace a subdivider's obligation to comply with the requirements of a city's general plan. (See § 65300 et seq.) As the majority notes, a city's general plan acts much like a land use constitution, governing future land use decisions within its jurisdiction. (*Lesher Communications, Inc. v. City of Walnut Creek* (1990) 52 Cal.3d 531, 540, 542.) I see no reason that a general plan ought to be afforded less importance than the Coastal or Mello Acts.

I depart with the majority opinion in its conclusion that substantial evidence supports the City's determination that the park's proposed conversion is inconsistent with the City's general plan. The "open space" element (see § 65560 et seq.) of the City's

---

[1]     All further statutory codes are to the Government Code.

general plan is the only contested issue in the current case. As relevant to the current case, the City's "Open Space and Conservation Element" of its general plan reads as follows:

> "The Government Code requires that open space for preservation of natural resources be incorporated into the General Plan. Such resources include areas for the preservation of plant and animal life, areas of ecological and other scientific study value, rivers, streams, bays and estuaries, coastal beaches, and lake shores. The only such area identified within Carson is the lake within Carson Village Mobilehome Park. This lake, covering approximately 17 acres, provides habitat for a variety of plants and small animals."

In my view, the issue is whether the park's proposed conversion will damage or endanger the lake, with its habitat for a variety of plants and small animals. I see no evidence in the record to support a conclusion that a change in the structure of the ownership of the park — from a landlord, single owner (a limited partnership) to a collective of individual owners with a managing homeowners' association — will harm the lake. A mobile home park with a lake was present before conversion and will still be present after conversion. The change in identity of the owner of the property, which is all that is truly at issue here, has not been shown to pose a danger to the lake.

The majority opinion concludes that substantial evidence supports the City's finding that there would be a risk to the lake "because the residents would become unwilling and unsuitable stewards" of the lake. The ensuing discussion which follows, however, focuses on the environmental *conditions* of the lake, i.e., the physical problems and potential problems attendant with the lake. For example, the majority discusses trash, ongoing maintenance needs, and the future potential need for remedial measures in the event of a contamination incident arising from capped oil wells in the area. However, the critical issue in this case is the *management* of the lake property. That is, whether

2

there is evidence that the physical conditions of the lake are only capable of being properly managed with the existing single-owner structure in place, as opposed to a homeowners association after conversion. I do not see any such evidence. There is no evidence in the record to support a conclusion that the park's residents acting through a homeowners association would be less suitable stewards of the lake property than the current landlord, single owner of the property, or that the City would incur more difficulties in compelling needed environmental remedial measures against numerous individual owners acting through a homeowners association than it would against a landlord, single-owner of the property.

I acknowledge that *Dunex, Inc. v. City of Oceanside* (2013) 218 Cal.App.4th 1158 (*Dunex*) supports the majority's opinion, but I am not convinced. *Dunex* offers no discussion of any evidence supporting its conclusion that a change from a landlord, single-owner structure to a homeowners association, multiple-owner structure poses a risk to open space. *Dunex* seems simply to accept that a city may find that individual owners of a mobile home park will not be as good as citizens as a prior landlord, single-owner had been. If *Dunex* is stating that the individual owners of a mobile home park will not have the financial resources to respond to problems as the prior landlord, single owner did, its conclusion is based on speculation as to the financial condition of the prior landlord owner. There is no *evidence* cited in *Dunex* actually showing the financial ability of *anyone* to address environmental problems. In the absence of evidence that a homeowners association would be less responsible, and or have less resources in matters of property management than a landlord, single owner of a property, I would affirm.

The only evidence in the record here concerning the *management* of the lake property is that the current owner undertook clean-up efforts in 2006 and 2007, and that annual maintenance costs are around $50,000. It is undisputed that there are 420 spaces in the park. Thus, the annual maintenance costs divided amongst residents would be approximately $120, or about $10 per month. I would not find the imposition of $10 per month in maintenance costs to support a conclusion that the management of the park will be harmed in the future.

3

I would affirm the trial court's judgment directing the City to approve the park's application to convert its mobile home park from a rental facility into a subdivision of resident-owned lots with a homeowners association.


BIGELOW, P.J.

4