Filed 2/28/18; Certified for Publication 3/22/18 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| COVINA RESIDENTS FOR RESPONSIBLE DEVELOPMENT, | B279590 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BS147861) |
| v. | |
| CITY OF COVINA, | |
| Defendant and Respondent; | |
| CITY VENTURES, INC. et al., | |
| Real Parties in Interest. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Amy D. Hogue, Judge. Affirmed.

Briggs Law Corporation, Cory J. Briggs and Anthony N. Kim, for Plaintiff and Appellant Covina Residents for Responsible Development.

Richards, Watson & Gershon and Ginetta L. Giovinco for Defendant and Respondent City of Covina.

Holland & Knight, Amanda J. Monchamp and Joanna L. Meldrum, for Real Parties in Interest City Ventures, Inc. and City Ventures LLC.

_____

In this CEQA[1] action Covina Residents for Responsible Development (CRRD) appeals from the trial court's denial of its petition for writ of mandate seeking to overturn the City of Covina's approval of a 68-unit, mixed-use, infill project[2] located a quarter-mile from the Covina Metrolink commuter rail station. CRRD contends the project's significant parking impacts required the City to prepare an environmental impact report (EIR) rather than the mitigated negative declaration it adopted in March 2016. We conclude section 21099, subdivision (d)(1), which took effect three months before the City approved the project, exempts the project's parking impacts, as alleged by CRRD, from CEQA review. We also reject CRRD's contentions the City's approval of the project violated the Subdivision Map Act and affirm the judgment.

_____

[1]     CEQA refers to the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) and the regulations implementing it (Cal. Code Regs., tit. 14, § 15000 et seq.) (CEQA Guidelines). Citations are to the Public Resources Code unless otherwise stated.

[2]     An infill project develops vacant or under-used parcels within urban areas that are already largely developed. (See generally § 21099, subd. (a)(4).)

2

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Proposed Project*

In 2000 the City adopted a general plan and certified a program-level EIR governing future development within the City. In October 2004 the City adopted the Town Center Specific Plan (TCSP), which governs the site where the project is to be located and certified a second EIR tiered from the General Plan EIR. The TCSP EIR identified the following objectives for development within the town center: facilitate infill development and redevelopment of deteriorated properties "particularly for housing creation and rehabilitation and economic development purposes"; revitalize and attract more people and retail businesses; "[c]apture [of] all potential benefits resulting from the Metrolink Commuter Train station"; and "[p]ermit mixed uses in appropriate areas in the downtown . . . to provide needed housing" "via 'urban village' or livable cities concepts, as a means for . . . maximizing the efficiency and attractiveness of transit usage, reducing vehicle trips, and encouraging and facilitating pedestrian circulation."

By 2012 Real Parties in Interest City Ventures, Inc. and City Ventures LLC (City Ventures) had assembled a 3.4-acre site within the TCSP area bordered by Orange Street, Citrus Avenue, San Bernardino Road and 3rd Avenue. The site is comprised of an entire block with 27 parcels (24 of which will be used by the project) located a quarter-mile from the Covina Metrolink station and served by a major bus line. The site is paved in its entirety, contains 25,000 square feet of existing but vacant single-story buildings previously used by a car dealership, and is surrounded by developed residential and commercial parcels with improved streets, sidewalks, curbs and gutters. City staff described the condition of the site as "deteriorating and underutilized" and

3

acknowledged the City and former Redevelopment Agency had worked for several years to remove blighted conditions and revitalize the area.

City Ventures submitted the proposed project application to the City in December 2012. Over the next year City Ventures adapted the project to accommodate the recommendations of City staff. On November 20, 2013 the City circulated an initial study and proposed mitigated negative declaration (MND), which described measures incorporated into the project to mitigate potentially significant environmental impacts.

As proposed to the City planning commission in December 2013, the project consisted of 52 townhomes (32 three-bedroom plans and 20 four-bedroom plans), 16 urban lofts (12 one-bedroom plans and 4 two-bedroom plans), four live-work units (three four-bedroom plans and one three-bedroom plan), 8,000 square feet of retail space and a 4,800 square-foot gallery. Each unit was designed with rooftop solar energy to power the home and a 220-volt outlet intended for use as an electric vehicle charging station. Common areas were to be planted with drought-tolerant plants and trees.

City staff calculated the project, as designed, would require 238 parking spaces (174 residential spaces and 64 nonresidential spaces). Anticipating the project, as a transit-oriented, mixed-use development, would be eligible for parking credits under the TCSP, City Ventures proposed a design with 177 spaces that assumed the availability of 23 off-site, street parking spaces. The staff report prepared for the planning commission concluded the project was short 61 spaces, a number increased to 84 if street parking was excluded from the count. The report recommended allowance of the 23 street parking spaces but recommended

4

against allowing credits for shared residential-commercial spaces and transit proximity for three reasons:  existing parking pressures in the area and City Ventures's inability to provide adequate detail about future tenants and failure to address ride-sharing or public transportation subsidies necessary to earn transit-related credits.[3]  The staff report concluded the project "[left] too much of its parking requirements unmitigated" and recommended City Ventures be asked to work with the City to redesign the project to satisfy TCSP parking requirements.

Based on these unresolved parking concerns, the planning commission denied approval of the project at its December 10, 2013 meeting.

2. *The Redesigned Project*

City Ventures appealed the planning commission's denial to the city council and submitted a modestly revised project reducing the retail and gallery space by 3,600 square feet, a revision that cut the parking deficit (and need for parking reduction credits) to 46 spaces.  The city council considered the revised project at its meeting on January 21, 2014, told City Ventures to come back "with something that is viable and practical," and continued the hearing to February 4, 2014.

City Ventures again revised the project by redesigning all four-bedroom units to three bedrooms, reducing the total number

---

[3]  As the staff report explained, "The TCSP provides that 'The City may approve a reduction in the number of off-street parking spaces when a development is located within 1/4 mile of a Metrolink station, an employer implements a ride-sharing program approved by the City, and/or an employer pays for at least 50% of the cost of public transit for its employees.'"

of three-bedroom units, increasing the number of two-bedroom units and adding six on-site parking spaces. This redesign eliminated the residential parking deficit and reduced the commercial parking deficit to 19 spaces. Because a pending traffic analysis had not been received, the staff report recommended any action on the item be continued to February 18, 2014. At the February 4, 2014 hearing the developer spoke about the modifications to the project and fielded questions from council members. Two residents opposed the project: One urged the council to ensure adequate parking and support for the commercial uses, noting the failure of the commercial section of a previous mixed-use project; and another spoke against the design of the buildings on Orange Street.

The staff report for the February 18, 2014 council meeting advised the council, "With the exception of parking concerns, the Planning Commission and Staff have been overall in support of the Project. With these latest revisions . . . , Staff believes its prior analysis presented to the Planning Commission (supporting all other Project aspects except parking) remains in effect and continues to support overall approval of the Project." The staff report also advised that new architectural features had been added to the townhome design in response to public input. Further, the project as proposed was now in compliance with all zoning ordinances if the council decided to approve City Ventures's request for 19 transit-related parking credits. The staff recommended the adoption of a MND if the council approved the project. Only one letter had been submitted during the comment period for the MND. In response staff had made minor

revisions to the MND, clarifying the findings; consequently, recirculation was not warranted.[4]

The council again considered the project at the February 18, 2014 meeting. Council members questioned City Ventures at length about the parking shortage and inquired whether one of the buildings containing four units could be omitted to allow additional on-site parking. Three downtown business owners spoke against allowing the project to receive parking credits, voicing particular concern about the assumption employees would use public transit and the failure of another recently developed project to secure retail tenants because of a similar parking shortage. Asking City Ventures to consider further alterations to the project, the council continued the public hearing on the project to March 4, 2014.

Pending the March 4, 2014 meeting, City Ventures again revised the project by replacing a four-unit residential loft building with a 14-space parking lot. The revision reduced the number of units from 72 to 68. In addition, 614 square feet of gallery space was eliminated, and 600 square feet of the commercial building was changed to administrative office space. With these final revisions the planning staff concluded the project met all City parking requirements and no longer required an

---

[4] Additional letters were received after the comment period had closed, including one from counsel for CRRD appearing on behalf of Bentley Real Estate LLC, an entity linked to Ziad Alhassen, the former owner of the defunct car dealership on the project site and owner of the remaining parcels on the block. All of the comment letters challenged the project's failure to provide adequate parking.

award of public transit credits.  The staff report recommended the council approve the project.

Cory Briggs, counsel for CRRD, spoke at the meeting on behalf of his then-client Bentley Real Estate LLC.  Having submitted a letter opposing the project earlier that afternoon, Briggs objected that the council had failed to provide the public with an opportunity to review the revisions to the project.  Briggs also accused the council of violating the Brown Act by discussing his client's opposition to the project in closed session.  The city attorney told Briggs the closed session was justified by comments made by his client to several staff members threatening litigation.[5]

Following a break to allow attendees to review the revisions to the project, the public hearing was reopened.  After several council members spoke, the city clerk, apparently unaware of any other requests to speak, closed the meeting.  The council voted unanimously to approve the project and to adopt the MND, making all required findings, including those necessary for approval of City Ventures's application for a subdivision tentative tract map.  On March 6, 2014 the City filed a notice of determination under sections 21108 and 21152, as well as a notice of categorical exemption for a Class 32 infill project pursuant to CEQA Guidelines, section 15332.

---

[5]     As described by the city attorney, Ziad Alhassen had spoken with several staff members and stated he had not been able to reach a price with City Ventures for the remaining parcels and intended to protect his interests with litigation if necessary.  A City Ventures representative told the council he had been in discussions with Alhassen and would continue efforts to purchase the parcels at a reasonable price.

3.  *The Litigation*

CRRD filed this action on April 3, 2014.  The petition alleged three causes of action:  a CEQA claim the City had improperly approved the project without preparing an EIR and improperly tiered the MND from the TCSP EIR; a claim the City had violated the Subdivision Map Act (Gov. Code, §§ 66473.5, 66474) by failing to make the necessary findings for approval of the project or, in the alternative, making findings that were not supported by substantial evidence in the record; and a claim the City had violated due process by failing to allow a meaningful opportunity to respond to last-minute revisions in the project.[6]

CRRD's principal CEQA challenge focused on the project's allegedly inadequate parking.  After briefing and a hearing the trial court denied the petition, finding (a) a lack of substantial evidence to support CRRD's claim the parking shortage would result in any environmental impacts; (b) any parking impacts from the project were exempt from environmental review under section 21099; (c) the City had properly tiered its environmental review from the TCSP EIR; (d) the City did not violate the Subdivision Map Act; and (e) the record did not indicate any person had been prevented from speaking at the final council meeting.

## DISCUSSION

1.  *CRRD Has Failed To Establish a Violation of CEQA*

    a.  *CEQA overview*

CEQA and the regulations implementing it "embody California's strong public policy of protecting the environment."

---

[6]    CRRD has abandoned its due process claim on appeal.

9

(*Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281, 286.)  As the Supreme Court has explained, "CEQA was enacted to advance four related purposes:  to (1) inform the government and public about a proposed activity's potential environmental impacts; (2) identify ways to reduce, or avoid, environmental damage; (3) prevent environmental damage by requiring project changes via alternatives or mitigation measures when feasible; and (4) disclose to the public the rationale for governmental approval of a project that may significantly impact the environment." (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 382; accord, *Respect Life South San Francisco v. City of South San Francisco* (2017) 15 Cal.App.5th 449, 454.)

"The first step [under CEQA] 'is jurisdictional, requiring that an agency conduct a preliminary review in order to determine whether CEQA applies to a proposed activity.' [Citation.]  As part of the preliminary review, the public agency must determine the application of any statutory exemptions that would exempt the proposed project from further review under CEQA.  If, as a result of preliminary review, 'the agency finds the project is exempt from CEQA under any of the stated exemptions, no further environmental review is necessary.  The agency may prepare and file a notice of exemption, citing the relevant section of the Guidelines and including a brief "statement of reasons to support the finding."'" (*Concerned Dublin Citizens v. City of Dublin* (2013) 214 Cal.App.4th 1301, 1309-1310; see CEQA Guidelines, § 15062, subd. (b) ["[a] notice of exemption may be filled out and may accompany the project application through the approval process"].)

When an activity is a project and does not fall under a CEQA exemption, the agency must "conduct an initial study to determine if the project may have a significant effect on the environment." (CEQA Guidelines, § 15063, subd. (a).) If no substantial evidence shows the project may have a significant environmental effect, the agency must prepare a negative declaration describing the reasons for this determination. (CEQA Guidelines, §§ 15063, subd. (b)(2), 15070; see *Parker Shattuck Neighbors v. Berkeley City Council* (2013) 222 Cal.App.4th 768, 776.) "If there is such evidence, "'but revisions in the project plans 'would avoid the effects or mitigate the effects to a point where clearly no significant effect on the environment would occur' and there is no substantial evidence that the project as revised may have a significant effect on the environment, [an MND] may be used.""" (*Parker Shattuck,* at p. 776; see § 21064.5; *Friends of the College of San Mateo Gardens v. San Mateo Community College Dist.* (2016) 1 Cal.5th 937, 945 (*Friends of the College*).)

With limited exceptions the lead agency must prepare an EIR "whenever substantial evidence supports a fair argument that a proposed project 'may have a significant effect on the environment.'" (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123; accord, *Friends of the College*, *supra*, 1 Cal.5th at p. 945; *Tomlinson*, *supra*, 54 Cal.4th at p. 286; *Parker Shattuck Neighbors v. Berkeley City Council*, *supra,* 222 Cal.App.4th at p. 777; see §§ 21100, 21151; CEQA Guidelines, § 15064, subd. (f)(1).) Explaining this standard, the Supreme Court has stated, "a reviewing court may not uphold an agency's decision [not to prepare an initial EIR under the fair argument test] 'merely because substantial evidence was presented that the project would not have [a

11

significant environmental] impact.  The [reviewing] court's function is to determine whether substantial evidence support[s] the agency's conclusion as to whether the prescribed "fair argument" could be made.  If there [is] substantial evidence that the proposed project might have a significant environmental impact, evidence to the contrary is not sufficient to support a decision to dispense with preparation of an EIR and adopt a negative declaration, because it [can] be "fairly argued" that the project might have a significant environmental impact.  Stated another way, if the [reviewing] court perceives substantial evidence that the project might have such an impact, but the agency failed to secure preparation of the required EIR, the agency's action is to be set aside because the agency abused its discretion by failing to proceed "in a manner required by law.""" (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1112, citation omitted.)  The fair argument standard thus creates a low threshold for requiring an EIR, reflecting the legislative preference for resolving doubts in favor of environmental review.  (*Latinos Unidos de Napa v. City of Napa* (2013) 221 Cal.App.4th 192, 200; *Taxpayers for Accountable School Bond Spending v. San Diego Unified School Dist.* (2013) 215 Cal.App.4th 1013, 1034 (*Taxpayers*).)[7]

---

[7]      City Ventures and the City, citing *Friends of the College, supra,* 1 Cal.5th 937, contend the substantial evidence standard, rather than the more rigorous fair argument standard, governs review of the City's actions in this case.  In *Friends of the College* the Supreme Court held that an agency's decision to proceed under CEQA's subsequent review provisions (see § 21166; CEQA Guidelines, § 15162) is subject to substantial evidence review, reasoning that the previous environmental review retains

b. *Standard of review*

In reviewing the City's actions "for compliance with CEQA, we ask whether the agency has prejudicially abused its discretion; such an abuse is established 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' (§ 21168.5.) [Fn. omitted.] In determining whether there has been an abuse of discretion, we review the agency's action, not the trial court's decision. '[I]n that sense appellate judicial review under CEQA is de novo.'" (*Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 62 Cal.4th 204, 214-215.) We determine de novo whether the agency has followed the proper procedures, and we review the agency's substantive factual conclusions for substantial evidence. (*Id.* at p. 215.) We may not interpret CEQA or its guidelines "in a manner which imposes procedural or substantive requirements beyond those explicitly stated." (§ 21083.1)

We apply a de novo standard of review to questions of statutory interpretation. (*Concerned Dublin Citizens v. City of*

---

relevance and warrants increased deference to the agency's determination. (*Friends,* at pp. 951-953.)

While this analysis is superficially appealing because the City relied in part on the TCSP EIR in choosing to adopt an MND, the City did not proceed under the subsequent review provisions at issue in *Friends of the College*. Instead, the City structured its environmental review for a new, rather than modified, project under CEQA's tiering provisions (§§ 21093, 21094; CEQA Guidelines, § 15152). (See *Friends of the College, supra,* 1 Cal.5th at p. 950 ["the subsequent review provisions . . . have no application if the agency has proposed a new project that has not previously been subject to review"].)

13

*Dublin, supra,* 214 Cal.App.4th at p. 1311; *San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo Valley Unified School Dist.* (2006) 139 Cal.App.4th 1356, 1382.) "The scope of an exemption may be analyzed as a question of statutory interpretation and thus subject to independent review." (*San Lorenzo Valley,* at p. 1382.)  In determining the availability of a statutory exemption, "'we review the administrative record to see that substantial evidence supports each element of the exemption.  [Citations.]  "There must be 'substantial evidence that the [activity is] within the exempt category of projects.'  [Citation.] That evidence may be found in the information submitted in connection with the project, including at any hearings that the agency chooses to hold."'" (*Concerned Citizens of Dublin,* at p. 1311, quoting *Great Oaks Water Co. v. Santa Clara Valley Water Dist.* (2009) 170 Cal.App.4th 956, 973.)

> c. *The alleged parking impacts of the project are exempt from environmental review under section 21099, subdivision (d)(1)*

"There are two types of exemptions:  statutory, which are enacted by the Legislature and are not subject to exceptions, and categorical, which are adopted in the Guidelines and are subject to exceptions.  [Citation.]  'If the project is in an exempt category for which there is no exception, "'no further environmental review is necessary.'"'" (*Respect Life South San Francisco v. City of South San Francisco, supra,* 15 Cal.App.5th at p. 455; accord, *Parker Shattuck Neighbors v. Berkeley City Council, supra,* 222 Cal.App.4th at p. 776.)

Enacted in 2013 and effective on January 1, 2014, section 21099, subdivision (d)(1), provides, "Aesthetic and parking impacts of a residential, mixed-use residential, or employment

14

center project on an infill site within a transit priority area shall not be considered significant impacts on the environment." (See Stats. 2013, ch. 386, § 5, pp. 705-706.)  Because section 21099 took effect after the City had completed its initial study and circulated the proposed MND, the City did not rely on this statute in March 2014 when it adopted the MND and approved the project.[8] Nonetheless, section 21099 exempts the project's parking impacts, as alleged by CRRD, from CEQA review.

Section 21099 was enacted as part of Senate Bill No. 743 (2013-2014 Reg. Sess.) to further the Legislature's strategy of encouraging transit-oriented, infill development consistent with the goal of reducing greenhouse gases announced in the "Sustainable Communities and Climate Protection Act of 2008" (Stats. 2008, ch. 728, § 1; Stats. 2009, ch. 354, § 5), also known as Senate Bill No. 375.  Senate Bill No. 375, in turn, was enacted to implement the California Global Warming Solutions Act of 2006

---

[8]    The City's notice of exemption cited a categorical exemption under CEQA Guidelines, section 15332 for Class 32 infill development.  (See *Tomlinson v. County of Alameda, supra,* 54 Cal.4th at p. 288, fn. 4 [discussing requirements for the Class 32 categorical exemption for infill development:  "'(a)  The project is consistent with the applicable general plan designation and all applicable general plan policies as well as with applicable zoning designation and regulations.  [¶]  (b)  The proposed development occurs within city limits on a project site of no more than five acres substantially surrounded by urban uses.  [¶] (c)  The project site has no value, as habitat for endangered, rare or threatened species.  [¶]  (d)  Approval of the project would not result in any significant effects relating to traffic, noise, air quality, or water quality.  [¶]  (e)  The site can be adequately served by all required utilities and public services.'"  (Italics omitted.)].)  The parties have not raised this exemption on appeal.

15

(Stats. 2006, ch. 488, § 1, p. 3419),[9] and "is one in a series of executive, legislative and administrative measures enacted to reduce greenhouse gas emissions and their adverse effects on our climate." (*Bay Area Citizens v. Association of Bay Area Governments* (2016) 248 Cal.App.4th 966, 975; see also *Cleveland National Forest Foundation v. San Diego Assn. of Governments* (2017) 3 Cal.5th 497, 506 [discussing Senate Bill 375; "[t]he Legislature . . . found the state could not meet its emission reduction goals without improved land use and transportation policy"]; *id.* at p. 522 ["When it comes to climate change, the state's long-term environmental goals are clear. Senate Bill 375 and other statutes have codified into California law the scientific consensus that the state must reduce greenhouse gas emissions over the next few decades."] (dis. opn. of Cuéllar, J.).)[10]

---

[9] Better known as Assembly Bill No. 32, the Global Warming Solutions Act of 2006 "established as state policy the achievement of a substantial reduction in the emissions of gases contributing to global warming." (*Center for Biological Diversity v. Department of Fish & Wildlife*, *supra*, 62 Cal.4th at p. 215.)

[10] As one commentator has explained, "The Sustainable Communities Act seeks to change California's existing land development patterns characterized by sprawl development—low-density residential uses (car-oriented suburbs) extending into exurban areas. Instead, the Sustainable Communities Act foresees compact patterns of dense residential development in mixed-use walkable communities located along public transit corridors. . . . [T]he Sustainable Communities Act assembles an arsenal of regulatory measures, including regional transportation plans, local land use planning, increased investment in transit, and enhanced intercity public transportation, all designed to reduce the number of vehicle miles traveled by personal cars and light trucks." (Glancy, *Vehicle Miles Traveled and Sustainable Communities* (2014)

There is little doubt section 21099 applies to the City Ventures project.[11] Section 21099, subdivision (a)(4), defines an "infill site" as "a lot located within an urban area that has been previously developed, or on a vacant site where at least 75 percent of the perimeter of the site adjoins, or is separated only by an improved public right-of-way from, parcels that are developed with qualified urban uses."[12] A "transit priority area" is defined as "an area within one-half mile of a major transit stop that is existing or planned . . . ." (§ 21099, subd. (a)(7).) The project site encompasses 24 parcels on a block previously developed for car dealerships and surrounded by qualifying urban uses approximately a quarter-mile from the Covina Metrolink station.

46 McGeorge L.Rev. 23, 25, fns. omitted; see also Kasner, *Arena Development and Environmental Review Reform Under SB 743* (2014) 25 Stan. L. & Policy Rev. 203, 208-209 ["Perhaps the best aspect of SB 743 is its changed approach toward transportation and parking analysis. Under the old legislative regime, development projects could demonstrate traffic mitigation by increasing parking lot size and adding lanes to surrounding surface streets. From an environmental perspective, these allowances provide little benefit, as congestion effects are offset but automobile use is encouraged. SB 743 allows for greater flexibility for projects while incentivizing public transit."].)

[11] CRRD argues section 21099 does not apply because the City completed the initial study and MND before the effective date of the statute. CRRD cites no authority for this argument, and we have found none. The project was approved three months after the effective date of the statute.

[12] CEQA defines a qualified urban use as "any residential, commercial, public institutional, transit or transportation passenger facility, or retail use, or any combination of those uses." (§ 21072.)

17

(See *Protect Telegraph Hill v. City and County of San Francisco* (2017) 16 Cal.App.5th 261, 272 [applying section 21099, subdivision (d)(1)'s exemption of aesthetic impacts from CEQA review to a residential infill project within a transit priority area].)

Section 21099 also directs the Office of Planning and Research (OPR) to propose revisions to the CEQA Guidelines "establishing criteria for determining the significance of transportation impacts of projects within transit priority areas" (subd. (b)(1)).  Upon certification, "automobile delay" or "traffic congestion" will no longer be considered a significant impact on the environment (subd. (b)(2)).  Subdivision (b) "does not relieve a public agency of the requirement to analyze a project's potentially significant transportation impacts related to air quality, noise safety, or any other impact associated with transportation," but clarifies, "the adequacy of parking for a project shall not support a finding of significance pursuant to this section."  (§ 21099, subd. (b)(3).)[13]

In arguing section 21099 does not exempt the parking impacts alleged here from review, CRRD emphasizes subdivision (b)(3)'s requirement that transportation-linked environmental impacts continue to be analyzed and points to the

---

[13]    As directed, OPR has proposed a new guideline (§ 15064.3, pending adoption by the Secretary of Natural Resources) and issued a technical advisory identifying "vehicle miles traveled (VMT) as the most appropriate metric to evaluate a project's transportation impacts."  (OPR, "Technical Advisory on Evaluating Transportation Impacts in CEQA" (November 2017), at p. 1, retrieved from http://www.opr.ca.gov/ceqa/updates/sb-743/, as of February 28, 2018.)

18

decision in *Taxpayers*, *supra*, 215 Cal.App.4th 1013, a decision that predates section 21099, in which Division One of the Fourth District found a project's impact on the parking of vehicles "a physical impact that could constitute a significant effect on the environment." (*Taxpayers*, at p. 1051.)

Decisions predating the enactment of section 21099 conflict somewhat in their analysis of parking impacts under CEQA. In *San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656 (*San Franciscans*) the First District observed, "[T]here is no statutory or case authority requiring an EIR to identify specific measures to provide additional parking spaces in order to meet an anticipated shortfall in parking availability. The social inconvenience of having to hunt for scarce parking spaces is not an environmental impact; the secondary effect of scarce parking on traffic and air quality *is*. Under CEQA, a project's social impacts need not be treated as significant impacts on the environment. An EIR need only address the *secondary physical* impacts that could be triggered by a social impact. (Guidelines, § 15131, subd. (a).)" (*San Franciscans*, at p. 697.) The court found the EIR at issue adequate in its analysis of parking impacts in the context of urban development: "[T]he EIR correctly concluded that '[p]arking shortfalls relative to demand are not considered significant environmental impacts in the urban context of San Francisco. Parking deficits are an inconvenience to drivers, but not a significant *physical* impact *on the environment*.'" (*Ibid.*)

*Taxpayers, supra,* 215 Cal.App.4th 1013, expressly disagreed with what it called "the broad statement in [*San Franciscans*] that a parking shortage is merely a social inconvenience and can never constitute a primary impact on the

19

environment." (*Taxpayers,* at p. 1051.)  The court opined, "[W]henever vehicles are driven or parked, they naturally must have some impact on the physical environment.  The fact that a vehicle's impact may be only temporary (e.g., only so long as the vehicle remains parked) does not preclude it from having a physical impact on the environment around it.  Therefore, as a general rule, we believe CEQA considers a project's impact on parking of vehicles to be a physical impact that could constitute a significant effect on the environment." (*Ibid.*)

The perceived conflict between these decisions can be explained by the context of the projects analyzed.  In *Taxpayers, supra,* 215 Cal.App.4th 1013, a school district had approved the installation of new stadium field lighting and other improvements at a suburban high school that had previously been unable to host evening sporting events.  (*Id.* at p. 1023.)  In evaluating whether a fair argument existed that the project's parking impacts could be significant during evening games, the court of appeal criticized the District's parking analysis, finding it contained "*no basis* on which to conclude the parking shortage of 174 spaces would be filled by available off site, street parking spaces" (*id.* at p. 1050) and noted the project would cause significant traffic congestion (a secondary impact) in the narrow, residential canyon streets surrounding the school (*id.* at p. 1053).

In contrast, the First District was reviewing the City's approval of a large Market Street redevelopment project the petitioners claimed would increase gridlock in the area.  (*San Franciscans, supra,* 102 Cal.App.4th at p. 666.)  The court agreed the project's location at a transit hub served by BART, as well as multiple bus and cable car lines, justified the EIR's conclusion that "'[p]arking shortfalls relative to demand are not considered

significant environmental impacts in the urban context of San Francisco" (*id.* at p. 697) and that "providing additional off-street parking would result in the adverse environmental impact of attracting more cars to the area, in conflict with the City's charter policy to encourage the use of public transit first and discourage the use of private automobiles in areas 'well served by public transit.'" (*Ibid.*) The court concluded the EIR "fulfilled its CEQA-mandated purpose by identifying ways in which the secondary *environmental* impacts *resulting from* the projected parking deficits could be mitigated, in keeping with the specific environmental strictures imposed by the City's own transit-first policy." (*Ibid.*)

Through its 2013 enactment of section 21099 the Legislature endorsed the approach of the First District in *San Franciscans* for urban, infill projects near transit hubs like the City Ventures project. While secondary parking impacts caused by ensuing traffic congestion ("air quality, noise, safety, or any other impact associated with transportation") must be addressed, parking impacts, in and of themselves, are exempted from CEQA review for these projects. (§ 21099, subd. (b)(3).)

Here, CRRD failed to submit any evidence of secondary impacts associated with the project's allegedly inadequate parking. Instead, the complaints identified by CRRD concern the lack of parking spaces for downtown businesses, a concern falling within the scope of section 21099, subdivision (d)(1). For instance, one business owner commented, "I have [four] parking spots in front of my building that I have had to work hard to keep for my clients . . . [t]hese people I'm sure will spill over to our spots." Another wrote, "Business space with adequate parking for owners, employees, and patrons is essential for the future of the downtown as a viable

21

business community. . . . I look out from the front of my store daily to the sight of empty storefronts." A petition drafted to oppose the project as originally designed accused the project of providing "ZERO onsite parking spaces for the owners, employees, and customers of the commercial space." As to secondary impacts associated with the claimed lack of parking, CRRD criticizes the MND's assertion the TCSP EIR had adequately analyzed traffic impacts for future development consistent with the TCSP but provides no explanation, let alone evidence, why that analysis was inadequate. While the City responded to the business owners' concerns by requiring the project to comply with existing parking requirements, that decision was not compelled by CEQA.

CRRD also asks us to speculate that the revised project's conversion of four- and three-bedroom apartments to three- and two-bedroom apartments will not prevent residents from adding additional tenants, thereby exceeding occupancy standards and generating increased parking demand. To prevent such behavior, however, the City included a condition of approval stating, "In order for the residential component of the project to meet City parking requirements in perpetuity, none of the dens or family rooms in the residential dwelling units shall be marketed for or advertised as bedrooms or used as bedrooms or for principally sleeping purposes. This restriction shall be stated in and enforced under the project-related Conditions, Covenants, and Restrictions (C, C & Rs)." This condition is binding on the future homeowners association and enforceable by the City (see Civ. Code, §§ 5975, 5980), and speculation about possible violations does not constitute substantial evidence of a significant impact. (See *East Sacramento Partnerships for a Livable City v. City of Sacramento* (2016) 5 Cal.App.5th 281, 297 ["'[i]n the absence of a specific factual

22

foundation in the record, dire predictions by nonexperts regarding the consequences of a project do not constitute substantial evidence'"].)

It may seem somewhat ironic to apply section 21099 to exempt from review the parking impacts of a project that, in the end, was revised to comply with existing City parking requirements. That is not the point, however; and section 21099 "does not preclude the application of local general plan policies, zoning codes, conditions of approval, thresholds, or any other planning requirements pursuant to the police power or any other authority." (§ 21099, subd. (b)(4); see also *id.*, subd. (e) ["[t]his section does not affect the authority of a public agency to establish or adopt thresholds of significance that are more protective of the environment"].) During the last 10 years, the Legislature has charted a course of long-term sustainability based on denser infill development, reduced reliance on individual vehicles and improved mass transit, all with the goal of reducing greenhouse gas emissions. Section 21099 is part of that strategy, and subdivision (d)(1) exempts parking impacts from CEQA review for qualifying infill projects located within a half-mile of a major transit stop. On the record presented here, this statutory provision applies to the City Ventures project and precludes CRRD's claim the project lacked adequate parking.

d. *The MND was properly tiered from the TCSP EIR*

"'Tiering' refers to using the analysis of general matters contained in a broader EIR (such as one prepared for a general plan or policy statement) with later EIRs and negative declarations on narrower projects; incorporating by reference the general discussions from the broader EIR; and concentrating the later EIR or negative declaration solely on the issues specific to the

23

later project." (CEQA Guidelines, § 15152.) "Unlike '[p]roject EIR[s],' which 'examine[ ] the environmental impacts of a specific development project' (CEQA Guidelines, § 15161), the CEQA provisions governing tiered EIRs 'permit[ ] the environmental analysis for long-term, multipart projects to be "tiered," so that the broad overall impacts analyzed in an EIR at the first-tier programmatic level need not be reassessed as each of the project's subsequent, narrower phases is approved.'" (*Friends of the College, supra,* 1 Cal.5th at p. 959, quoting *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 429.) "Tiering is proper 'when it helps a public agency to focus upon the issues ripe for decision at each level of environmental review and in order to exclude duplicative analysis of environmental effects examined in previous environmental impact reports.'" (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1170; accord, *City of Hayward v. Bd. Trustees of California State University* (2015) 242 Cal.App.4th 833, 849.)

CRRD challenges the MND's reliance on the TCSP EIR's analysis of traffic impacts, which it claims was insufficient for the impacts associated with the City Ventures project. CRRD acknowledges, however, the City was permitted to tier from the TCSP EIR "if the proposed action falls under one or more statutory or categorical exemptions . . . or if the potential project impacts have been adequately analyzed and mitigated" under that document. As discussed, the project's parking impacts are exempt under section 21099, subdivision (d)(1). Consequently, the only remaining issue raised by CRRD is the general allegation the MND's analysis of traffic impacts from the alleged parking shortage was inadequate.

CRRD's challenge based on traffic impacts suffers from multiple flaws. First, as the City notes, there is no parking shortage because the project, as approved, complied with the TCSP's parking requirements. Second, CRRD did not previously question the adequacy of the traffic analysis, independent of the claimed parking shortage. Finally, even if this argument were not forfeited because it was not raised in the trial court (see, e.g., *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2006) 136 Cal.App.4th 212, 226), it is without merit. The City conducted a project-specific trip analysis and required the project to comply with an imposed mitigation measure and improvements to San Bernardino Road as a final condition of approval based on those findings. CRRD has not identified any deficiencies or omissions in that analysis. Consequently, there is no evidence in the record to support CRRD's assertion the project had impacts not contemplated by the TCSP EIR, and the City properly tiered its review from that document.

In sum, CRRD has failed to provide any evidence the City violated CEQA by approving the project.

2. *The City Did Not Violate the Subdivision Map Act*

a. *Governing law and standard of review*

The Subdivision Map Act (Gov. Code, § 66410 et seq.) (the Act) is "'the primary regulatory control'" governing the subdivision of real property in California. (*Gardner v. County of Sonoma* (2003) 29 Cal.4th 990, 996; accord, *Carson Harbor Village, Ltd. v. City of Carson* (2015) 239 Cal.App.4th 56, 63.) The Act is "designed to promote orderly community developments and involves an application process that culminates in public hearings to determine whether a subdivision map will be approved."

25

(*Carson Harbor Village,* at p. 63.)  Under the Act, "the
"'[r]egulation and control of the design and improvement of
subdivisions'" is vested in local agency legislative bodies such as a
city council, which must adopt ordinances on the subject." (*Save
Laurel Way v. City of Redwood City* (2017) 14 Cal.App.5th 1005,
1012; see *Gardner*, at pp. 996-997.)  "'"[T]he propriety of virtually
any local decision affecting land use and development depends
upon consistency with the applicable general plan and its
elements.'""  (*Orange Citizens for Parks & Recreation v. Superior
Court* (2016) 2 Cal.5th 141, 153; see Gov. Code, §§ 65359
[requiring specific plans be consistent with general plan], 66473.5
[requiring tentative maps and parcel maps to be consistent with
general plan].)

An agency's decisions regarding project consistency with a
general plan are reviewed by ordinary mandamus.  "The inquiry in
such cases is 'whether  the decision is arbitrary, capricious,
entirely lacking in evidentiary support, unlawful, or procedurally
unfair.'" (*San Francisco Tomorrow v. City and County of
San Francisco* (2014) 229 Cal.App.4th 498, 515-516.)  "[A]
consistency determination is entitled to deference as an extension
of a planning agency's '"unique competence to interpret [its]
policies when applying them in its adjudicatory capacity."'
[Citation.]  Reviewing courts must defer to a procedurally proper
consistency finding unless no reasonable person could have
reached the same conclusion." (*Orange Citizens for Parks and
Recreation v. Superior Court, supra,* 2 Cal.5th at p. 155; accord,
*San Franciscans, supra,* 102 Cal.App.4th at pp. 667-678; see
*Joshua Tree Downtown Business Alliance v. County of
San Bernardino* (2016) 1 Cal.App.5th 677, 695-696.)

26

"'"An action, program, or project is consistent with the general plan if, considering all its aspects, it will further the objectives and policies of the general plan and not obstruct their attainment."'" (*Orange Citizens for Parks & Recreation v. Superior Court, supra,* 2 Cal.5th at p. 153, quoting OPR, General Plan Guidelines (2003) p. 164.) "State law does not require perfect conformity between a proposed project and the applicable general plan. . . . [Citations.] In other words, it is nearly, if not absolutely, impossible for a project to be in perfect conformity with each and every policy set forth in the applicable plan. . . . It is enough that the proposed project will be compatible with the objectives, policies, general land uses and programs specified in the applicable plan." (*San Francisco Tomorrow v. City and County of San Francisco, supra,* 229 Cal.App.4th at p. 514, internal quotations omitted.)

b. *CRRD's Subdivision Map Act challenge lacks merit*

CRRD asserts the findings made by the City under Government Code sections 66473.5 and 66474 relating to the consistency of the project's tentative map with the TCSP were not supported by substantial evidence. Government Code section 66473.5 provides: "No local agency shall approve a tentative map, or a parcel map . . . unless the legislative body finds that the proposed subdivision, together with the provisions for its design and improvement, is consistent with the general plan . . . or any specific plan. . . . [¶] A proposed subdivision shall be consistent with a general plan or a specific plan only if the local agency has officially adopted such a plan and the proposed subdivision or land use is compatible with the objectives, policies, general land uses, and programs specified in such a plan." Government Code section 66474 requires the legislative body of a

27

city or county to deny approval of a tentative or parcel map unless it makes a series of findings related to consistency of the proposed map and design of the project with the general or specific plan (subds. (a) & (b)), the suitability of the site for the type and density of the development (subds. (c) & (d)), the likelihood the proposed map and improvements will cause environmental damage, harm wildlife and habitat or cause serious public health problems (subds. (e) & (f)) and the effect of the map and project on public easements (subd. (g)).  The necessary findings under these sections were adopted at the city council's March 4, 2014 meeting.

Once again, CRRD's principal complaint about the City's findings concerns parking.  CRRD argues the project does not comply with the parking standards set forth in the TCSP and criticizes City Venture's "stunt" of relabelling bedrooms as dens, a modification CRRD believes will be easily circumvented.  As discussed, CRRD's argument is based on speculation, rather than evidence, and does not support the relief sought.  CRRD has also emphasized the importance of adequate parking for the business community.  The City responded to that concern by insisting the project fully comply with the parking requirements of the TCSP.

Attempting to broaden its focus from parking to traffic circulation, CRRD claims the City's parking analysis "cherry-picked" certain circulation elements of the TCSP while ignoring others.  The example cited by CRRD relates to the TCSP's policies requiring developments to provide adequate pedestrian and bicycle access and create "[s]tronger pedestrian and bicycle linkages through the downtown."  CRRD, however, does not identify any evidence suggesting the project is not compatible with these policies; and the record refutes its contention.  As a higher density, mixed-use residential, transit-oriented project, the project

28

inherently encourages alternative travel modes. In reviewing changes to the subdivision map, the City found the project was "consistent with the General Plan in that it offers a different form of circulation in the sense of promoting walking and bicycling to meet Circulation Goal 1 of the General Plan," which identifies the goal of offering "'[a] balanced circulation system that offers multiple travel options so that people can live, work, shop, and play without relying on private vehicles.'" The proposed MND expressly inquired whether the project would "[c]onflict with adopted policies, plans, or programs regarding public transit, bicycle, or pedestrian facilities, or otherwise decrease the performance or safety of such facilities," and found no significant impact. The MND analysis explained, "The Project will not conflict with adopted policies, plans, or programs supporting alternative transportation in that it has been designed as a pedestrian-oriented community with direct access to the downtown, Metrolink Station, and bus stops and is required to comply with the policies of the [TCSP]."

In short, the project's map was fully consistent with the TCSP.

## DISPOSITION

The judgment is affirmed.  The City and City Ventures are to recover their costs on appeal.

PERLUSS, P. J.

We concur:

SEGAL, J.

BENSINGER, J.[*]

---

[*]     Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

30

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| COVINA RESIDENTS FOR RESPONSIBLE DEVELOPMENT,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>CITY OF COVINA,<br><br>    Defendant and Respondent;<br><br>CITY VENTURES, INC. et al.,<br><br>    Real Parties in Interest. | B279590<br><br>(Los Angeles County<br>Super. Ct. No. BS147861)<br><br>ORDER CERTIFYING OPINION FOR PUBLICATION |

THE COURT:

The opinion in this case filed February 28, 2018 was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the non-parties' requests pursuant to California Rules of Court, rule 8.1120(a) for publication are granted.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to be Published in the

Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in the Official Reports.

_____
PERLUSS, P. J.          SEGAL, J.          BENSINGER, J.[*]

_____

[*]     Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

2